**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **HUMBLE SURGICAL HOSPITAL,** | § | **CASE NO. 17-31078-H2-11** |
| **LLC, et. al.,**[1] | § | |
| | § | **Joint Administration Pending** |
| **Debtors** | § | |

**DECLARATION OF JEFFREY M. ANAPOLSKY IN SUPPORT**
**OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Pursuant to 28 U.S.C. § 1746, I, Jeffrey M. Anapolsky, declare under penalty as follows:

1.      I am a Managing Director with The BVA Group LLC ("BVA Group"), which has a place of business at 1000 Louisiana St., Suite #6925, Houston TX 77002. I am duly authorized to execute this declaration on behalf of BVA Group Restructuring and Advisory LLC ("BVA Restructuring"), an affiliate of BVA Group, in support of the above-referenced Chapter 11 Petitions and the First Day Motions related thereto. As part of my duties with BVA Restructuring, I serve as the Chief Restructuring Officer ("CRO") of (a) Humble Surgical Hospital, LLC ("HSH"), (b) Humble Surgical Holdings, LLC ("Holdings"), (c) K&S Consulting ASC, LP ("K&S ASC"), and (d) K&S Consulting Management, LLC ("K&S Management") (collectively, the "Debtors"). I have served in this capacity for the Debtors since approximately February 17, 2017, and I am familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

---

[1] The Debtors in these cases, along with the last four digits of their respective taxpayer ID numbers, are Humble Surgical Hospital, LLC (4960), Case No. 17-31078-H2-11; Humble Surgical Holdings, LLC (9350), Case No. 17-31079 -H2-11; K&S Consulting ASC, LP (5512), Case No. 17-31080-H2 -11; and K&S Consulting Management, LLC (5422), Case No. 17-31081-H2-11.

2.      I submit this Declaration to assist the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") and other parties in interest in understanding the circumstances that compelled the Debtors' commencement of these Chapter 11 cases (the "Cases") and in support of the Debtors' voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and the pleadings filed by the Debtors on the date hereof (the "Petition Date") in the Bankruptcy Court.  I have reviewed the factual support set forth in each of the Debtors' "First Day" pleadings (described below) and attest to the accuracy thereof.  Except as indicated otherwise, all facts set forth herein are based on my personal knowledge, discussions with current and former members of the Debtors' senior management and professional advisors, review of relevant documents, or opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on the Debtors' behalf.

## OVERVIEW OF THE DEBTORS' BUSINESSES

3.      HSH is located in Humble, Texas which provides services through its hospital and medical office building for patients in Humble, Kingwood, Atascocita, The Woodlands, and other communities in greater Houston.  The medical campus is over 75,0000 square feet and HSH provides a full range of services including inpatient and outpatient surgeries in the areas of neuro-spine; general surgery; ear, nose and throat; orthopedics; ophthalmology; podiatry; pain management; nuclear medicine; non-invasive cardiology; and gastroenterology specialties.  Currently, with approximately 25 board-certified physicians, many of HSH's services are provided on an outpatient basis, meaning that patient care is performed in accordance with a physician's orders on the same day that the patient is released from the hospital.  Charges related to a surgery

or procedure are submitted for reimbursement by commercial payers and/or government programs and are invoiced to the patient for payment.

4.      In addition to surgery services, HSH provides ancillary services including a (i) radiology unit, (ii) diagnostic MRI unit, (iii) post-anesthesia care unit (PACU), (iv) inpatient unit with five beds, (v) emergency unit, and (vi) diagnostic laboratory services.   HSH currently has approximately 50 full-time employees, including registered nurses, dieticians, technicians, managers and housekeepers.

5.      Currently, HSH is an in-network provider with Blue Cross Blue Shield and United Healthcare, which together comprise approximately 75% of the Houston insurance marketplace, and is an active Medicare provider.

**Humble Surgical Hospital, LLC**

6.      In 2009, K&S ASC and 12 physician partners formed HSH after outgrowing their operations at a nearby facility, Renaissance Surgical Center North, LP.  HSH formed a wholly-owned subsidiary called FM 1960 Properties, LLC ("FM 1960") and partnered with PinPoint Commercial ("PinPoint"), a developer of over $140 million in healthcare assets in the Houston area, to acquire and retrofit an existing building at a cost of over $10 million (the "Hospital"). The Hospital is a single-story building comprised of 29,808 sq. ft located near the George Bush Intercontinental Airport.  Humble REP, LLC leased the Hospital to HSH pursuant to a 15-year lease dated December 7, 2009.  Soon thereafter, the owners sold their interests in the Hospital to G&E HC REIT II Surgical Hospital of Humble LLC,[2] an affiliate of Grubb & Ellis Co., which subsequently sold to Griffin-American Healthcare REIT II, which subsequently sold the asset as

---

[2] In 2010, HSH and G&E HC REIT II Surgical Hospital of Humble LLC entered into a new 15-year, absolute net lease.

part of a portfolio transfer to an affiliate of Northstar Realty Income Trust ("Northstar"), a public, non-traded real estate investment trust. As such, Northstar is HSH's current landlord.

7.      In 2012, PinPoint and FM 1960 developed a 45,519 sq. ft., three-story medical office building ("HSH MOB") adjacent and connected to the Hospital that contains physicians' offices, a pharmacy, and hospital administrative functions. HSH acquired the HSH MOB from the owner in 2013, and, in 2014, HSH entered into a master lease agreement and sold the HSH MOB to GA HC REIT II HUMBLE TEX MOB, LLC, which subsequently sold the asset as part of a portfolio transaction to Northstar. On April 1, 2014, HSH entered into, and K&S ASC guaranteed, a master lease to occupy and operate HSH MOB. The Debtors are considering rejecting the HSH MOB master lease.

8.      The Hospital was constructed to treat more than 500 cases per month from six state-of-the-art operating rooms, two procedure rooms and five inpatient beds. However, liquidity constraints – mostly due to costly litigation and unpaid insurance claims – have caused HSH to underperform and the Hospital to be underutilized. In 2016, HSH treated approximately 1,000 patients with total billings of approximately $20 million.

9.      HSH was one of the first healthcare providers in the region to offer the Mazor Renaissance™ robotics system, which allows for greater precision for both minimally invasive and complex spine surgeries. Among other amenities, the Hospital offers private inpatient rooms, wireless Internet connectivity, complimentary parking, on-site security and video surveillance, on-site dining at the Humble Café, and complimentary bottled water, coffee and snacks.

10.      Currently, with approximately 25 board-certified physicians, HSH provides both inpatient and outpatient surgery options for treating many specialty areas of medicine, including:

(i)      Spine (all level fusion, laminectomy, MILD® procedure, minimally invasive procedures);

(ii)    Pain Management (epidural injections, facet blocks, radio frequency thermal coagulation (RFTC), joint injection, spinal cord stimulator, peripheral nerve stimulator, permanent pain pump placement, neurolysis);

(iii)    Orthopedics (fracture care, orthroscopic procedures, repair for carpal tunnel syndrome, shoulder replacement, total hip replacement (inpatient), total knee replacement (inpatient);

(iv)    Ear, Nose and Throat (balloon sinuplasty, Functional Endoscopic Sinus Surgery (FESS), stenosis repair, septoplasty, treatment for sleep apnea obstruction, stapedectomy, tympanoplasty, myringotomy (ear tube insertion), tonsillectomy, adenoidectomy);

(v)    Opthalmology (removal of cataracts, laser eye surgery);

(vi)    Plastic and Reconstructive (brow lift/face lift, blepharaoplasty, rhinoplasty, chin augmentation, breast implant and reduction, abdominalplasty, liposuction, breast reconstruction);

(vii)    Cardiovascular (cardiac catheterization, percutaneous cardiac intervention/stents (PCI), permanent pacemaker insertion, ICD implants, cardioversion, echocardiology, peripheral vascular ultrasound, cardioversion, pacemaker battery change, peripheral vascular surgery, surgery for varicose veins);

(viii)    Gastroenterology (colonoscopy, flexible sigmoidoscopy);

(ix)    Podiatry (bunion removal, ingrown nail removal, treatment of plantar fasciitis, treatment of arthritic deformities, hammer toe corrections, fat-pad augmentation, foot ulcer removal for diabetic patients);

(x)    Urology and Gynecology (lithotripsy (removal of stones in bladder, kidney or urethra), adult circumcision, incontinence treatment, sterilization, Essure™ birth control implants, hysterectomy);

(xi)    Abdominal (laparoscopic cholecystectomy, hernia repair); and

(xii)   Bariatric (lap-band surgery, gastric bypass).

In addition to these surgical specialties, HSH has a fully-staffed Emergency Room with an on-site physician 24-7, and provides other services, such as laboratory and diagnostic testing, diagnostic imaging and other diagnostic studies.

11.     Currently, HSH accepts a variety of health insurance, primarily on an in-network basis from Blue Cross Blue Shield of Texas, United Healthcare, and Medicare.  HSH also accepts health insurance on an out-of-network basis from Aetna Life Insurance Company ("Aetna"), Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "Cigna"), Humana Health Plan of Texas, Inc. ("Humana"), and others.  From 2010 to 2014, HSH served most of its patients on an out-of-network basis.  From 2014 to present, HSH has been serving most of its patients on an in-network basis.

12.     In general, the phrase "in-network basis" means that healthcare providers have contracted to provide services to health plan members for a preferred, discounted amount.  However, definitions differ from insurance company to insurance company, as follows:

- Blue Cross Blue Shield of Texas: With in-network providers, health plan members receive the highest level of benefits, do not have to file the claims in most cases (the network provider will usually file the claims), and network providers cannot bill for costs exceeding the allowed amount.  With out-of-network providers, health plan members receive out-of-network level of benefits, may have to file their own claims and may be billed for charges that exceed the allowed amount.

- United Healthcare: A network includes all the healthcare providers who work with the insurance company to care for health plan members.  United Healthcare agrees to pay those

healthcare providers a certain amount of money for health plan members visits – usually a discounted rate.  Because of those discounts, health plan members usually pay less when they see a health care provider in the network versus one who is outside the network.

- Humana: Plans include a group of doctors, hospitals and clinics called a network.  This group of healthcare providers has contracted to provide services to Humana health plan members for less than what they typically charge for their services.  When health plan members go out-of-network, Humana covers less of the cost, so the health plan members' out-of-pocket costs may be higher.

- Medicare Health Maintenance Organization (HMO) Plans: In HMO plans, health plan members cannot get health care from any doctor, other healthcare provider, or hospital. They generally must seek out care and services from doctors, other health care providers, or hospitals in the plan's network, with certain exceptions such as emergency care.  In some plans, health plan members may be able to go out-of-network for certain services, usually for a higher cost.

13.     Other hospitals nearby the Hospital include:

| Hospital | # Beds | Type | Description | Control |
|---|---|---|---|---|
| **Humble** | | | | |
| HealthSouth Rehabilitation Hospital of Humble | 68 | Inpatient | Rehabilitation Services | Proprietary, Corporation |
| ICON Hospital | 54 | Inpatient & Outpatient | Long Term Acute Care | Proprietary, Corporation |
| Kindred Rehabilitation Hospital Northeast Houston | 46 | Inpatient | Rehabilitation Services | Proprietary, Corporation |
| Memorial Hermann Northeast Hospital | 255 | Inpatient & Outpatient | Short Term Acute Care | Voluntary Nonprofit |
| **Kingwood** | | | | |
| Kingwood Medical Center | 368 | Inpatient & Outpatient | Short Term Acute Care | Proprietary, Corporation |
| Kingwood Pines Hospital | 116 | Inpatient & Outpatient | Psychiatric Services | Proprietary, Corporation |
| Memorial Hermann Surgical Hospital Kingwood | 10 | Inpatient & Outpatient | Short Term Acute Care | Proprietary, Corporation |
| **The Woodlands** | | | | |
| CHI Saint Luke's Health - The Woodlands | 213 | Inpatient & Outpatient | Short Term Acute Care | Voluntary Nonprofit, Church |
| CHI Saint Luke's Health Lakeside Hospital | 30 | Inpatient & Outpatient | Short Term Acute Care | Proprietary, Partnership |
| HealthSouth Rehabilitation Hospital The Woodlands | 84 | Inpatient | Rehabilitation Services | Proprietary, Corporation |
| Memorial Hermann The Woodlands Hospital | 351 | *Currently reports on a consolidated basis with Memorial Hermann Southwest.* | | |

14.     HSH's key competitors include larger systems like Memorial Herman, CHI St. Luke's, Methodist and HCA.   Memorial Hermann Surgical Hospital Kingwood ("Memorial Hermann Kingwood") and CHI St. Luke's Health Lakeside Hospital ("St. Luke's Lakeside"). Memorial Hermann Kingwood, located approximately 8.4 miles from HSH, is a surgical hospital with six operating rooms and two treatment rooms.   Its surgeons perform procedures in the specialty areas of ENT, general, GI, gynecology, ophthalmology, orthopedic, pain, plastic, podiatry, spine and urology.   St. Luke's Lakeside, located approximately 27 miles from HSH, provides both inpatient and outpatient care and focuses on cardiology, interventional cardiology, sports medicine, and orthopedics in The Woodlands community.   St. Luke's Lakeside opened in 2009 and currently has 30 licensed beds with 797 in annual admissions.   HSH also competes with various hospitals and surgical centers in the area as well, not just those above.

**K&S Consulting ASC, LP**

15.     K&S ASC is a Texas limited partnership with a wholly-owned subsidiary, Holdings, that, in turn, owns units of HSH.

16.     On June 19, 2014, K&S ASC and Monroe Capital LLC ("Monroe Capital") entered into a term sheet whereby K&S ASC would acquire Northwest Anesthesiology and Pain Services using credit facilities provided by Monroe Capital.   This transaction, which did not involve HSH, never closed.   On December 17, 2015, Monroe Capital filed a complaint[3] against K&S ASC in the District Court for the Southern District of Texas ("District Court"), alleging breach of contract. Monroe Capital obtained a default judgment against K&S ASC and the case was closed on February 26, 2016.

---

[3] Case number 15-03659.

17.     Previously, K&S ASC had a wholly-owned subsidiary called Spring Central Holdings, LLC, which in turned owned units in subsidiary called Spring Central Hospital, LLC ("Spring Central").  On October 7, 2015, Spring Central filed a voluntary petition under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  Spring Central leased a 41,000 sq. ft. space from Spring Surgical Hospital Partners, LLC ("Spring Surgical"), located in Spring, Texas.  Spring Surgical maintained that Spring Central had been in default under the terms of the lease for not paying rent for approximately 4 -5 months amounting to approximately $1.0 million.   On December 7, 2015, the Bankruptcy Court ordered Spring Central to surrender possession of the leased premises to Spring Surgical.  The Bankruptcy Court then converted the case to Chapter 7 of the Bankruptcy Code, and Spring Central's assets were liquidated.  Spring Central closed on December 9, 2015.

18.     Previously, K&S ASC owned interests in Westside Surgical Holdings, LLC, which interests were transferred in December 2014.

19.     Previously, K&S ASC owned interests in Lake Woodlands Surgical Center RE, LLC, which, in turn, owned interests in Lake Woodlands Surgical Center, LLC, which sold its assets in September 2016.

**K&S Consulting Management, LLC**

20.     K&S Management is a Texas limited liability corporation.  K&S Management is the general partner of K&S ASC.

**Humble Surgical Holdings, LLC**

21.     Holdings is a Delaware limited liability company that owns 564 units of HSH. Holdings is wholly-owned by K&S ASC.

## DEBTORS' CAPITAL STRUCTURE

22.     Holdings, a Delaware limited liability company, owns 564 units of HSH, a Texas limited liability company, while physician-members own 390 units. There are 48 units in reserve. K&S ASC, a Texas limited partnership, owns 100% of Holdings. K&S ASC is owned 1% by K&S Management, a Texas limited liability company serving as general partner, and 99% by limited partners.[4]  A chart detailing the Debtors' organizational structure is attached hereto as **Exhibit A**.

23.     On August 12, 2010, HSH, K&S ASC, K&S Management, Renaissance Surgical Center – North L.L.P and Regions Bank NA ("Regions") entered into a working capital loan agreement in the amount of $3 million. On August 12, 2012, HSH and Regions entered into an amended and restated agreement in the same amount.

24.     On August 12, 2010, HSH, K&S ASC, K&S Management, Renaissance Surgical Center – North L.L.P and Regions entered into a term loan agreement in the amount of $5.88 million. On March 24, 2011, HSH LLC and Regions entered into a promissory note in the amount of $473,000. On November 28, 2012, HSH and Regions entered into an additional promissory note in the amount of $742,595.

25.     On July 10, 2013, HSH entered into a $10.0 million Renewal Term Note (the "Regions Note") with Regions. K&S ASC, K&S Management and FM 1960 guaranteed the Regions Note. Effective July 10, 2013, HSH and Regions agreed to a Second Amended and Restated Loan Agreement with Holdings, K&S ASC, K&S Management, and FM 1960 as guarantors. Under the Second Amended and Restated Loan Agreement, the parties agreed to

---

[4] K&S ASC's limited partners include Mustapha Kibirige, MD; Nagadia, LLC; and Red Blue Investments, LLC.

renew the existing revolving line of credit up to the lesser of $3 million or the borrowing base. The borrowing base is computed as 31% of eligible commercial/managed care accounts receivable (as defined therein).  The parties also agreed to consolidate and renew the existing term loans into a renewal term loan in the increased principal amount of $10 million to be repaid in escalating installments over a six-year period.  The loans were secured by a first priority lien.

## EVENTS LEADING TO CHAPTER 11

**Introduction**

26.     These Chapter 11 cases will involve attempts to recover tens of millions of dollars of unpaid medical bills from insurance companies and patients for the benefit of the Debtors' estates after appeals of two key lawsuits are resolved.  Despite nearly identical allegations, one District Court Judge ruled in favor of HSH while another District Court Judge ruled against HSH.

27.     These Chapter 11 cases were precipitated by an attempted garnishment action by Aetna related to a recent adverse District Court ruling and entry of final judgment by Judge Lynn N. Hughes against HSH of approximately $41 million, plus interest.  HSH immediately appealed this judgment to the U.S. Court of Appeals for the Fifth Circuit (the "Fifth Circuit").  HSH expects that the ruling will be reversed for several reasons, but needs time to pursue its appeal.  Due to Aetna's impending garnishment, the Debtors were faced with no other viable alternative besides filing these bankruptcy cases.

28.     The Aetna Complaint and Cigna Complaint, as defined below, are part of a series of strategic lawsuits filed by insurance companies against physician practices, surgical centers, and other provider organizations in many states – California, New Jersey, and Pennsylvania as well as Texas – instead of lobbying federal and state legislators for more insurer-friendly laws or setting stricter rules of payment of out-of-network medical services.  Insurers like Aetna and Cigna

generally charge a premium to their members for insurance that includes both in-network and out-of-network coverage but then frequently dispute a patient's decision to choose an out-of-network provider.   Aetna, for example, acknowledges publicly that it is named as a defendant in several class actions and individual law suits arising out of its practices related to payment of claims for services rendered to its members by out-of-network providers.  Among other things, these lawsuits against Aetna allege that it paid too little to its health plan members and/or providers for these out-of-network services.

29.     The Debtors' prior executives have flatly denied waiving any HSH patient's portion of his or her medical bills.  However, cash collections from patients is an ongoing problem for all U.S. hospitals, which historically may only collect as little as 20% of a patient's portion of the charges within 120 days of sending the first bill.  One aspect of my role as Chief Restructuring Officer will involve investigating the Debtors' prior billing and collections practices.  Another aspect of my role as Chief Restructuring Officer will involve attempting to collect unpaid amounts due from prepetition patients.

30.     Irrespective of their past practices, the Debtors today operate a hospital for approximately 25 physicians and approximately 50 employees to provide hundreds of patients with mostly outpatient surgical procedures that are primarily covered by in-network providers Blue Cross Blue Shield of Texas and United Healthcare as well as Medicare.

**Aetna Litigation**

31.     One reason why HSH is confident that it will prevail against Aetna on appeal is that this case never went to trial and Judge Hughes struck HSH's answer and counterclaims without argument.  Aetna litigation against HSH spanned nearly five years and required the Debtors to divert considerable time and resources from day-to-day operations to defend themselves.  In its

complaint (the "Aetna Complaint"), Aetna, represented by lead attorney John Shely of Andrews Kurth Kenyon LLP, claimed that HSH "submitted false and misleading claims," "entered into waiver agreements with patents" regarding deductibles, and "failed to disclose to patients that the referring provider had a financial interest in [HSH]." While the Debtors vigorously denied all allegations in the Aetna Complaint and asserted counterclaims against Aetna, HSH's legal representation experienced disruptive turnover,[5] resulting in discovery issues and a fragmented defense. Rather, on December 31, 2016, Judge Hughes issued his Opinion on Debt and Truculence allowing Aetna, at its election, to take from HSH (a) $41,411,650.98 – the amount Aetna paid HSH from August 2010 through October 2013; (b) $20,248,259.65 – the difference between what Aetna paid HSH as an out-of-network provider from August 2, 2010, to May 11, 2012, and what it would have paid HSH as an in-network provider; or (c) $12,423,295.29 – the thirty percent "kickbacks" alleged to have been paid by HSH with Aetna's money.

32.     In its motion to reconsider, HSH explained:  "The court's partial summary judgment is improper because the summary judgment record shows that there is conflicting summary judgment evidence concerning all of these issues, necessitating a trial, not summary disposition." and notes that the award of approximately $41 million "disgorges every dollar ever paid by Aetna to Humble, a finding that defies reason."

33.     While the case was pending, it is my understanding that Aetna unilaterally offset millions of dollars of undisputed claims by HSH against the amounts that Aetna felt it had previously overpaid, draining precious liquidity from the Debtors.

---

[5]     HSH's initial lead counsel left Jackson Walker, L.L.P. to accept a position at K&L Gates LLP. This change of employer left HSH with a legal team spread across two law firms. In an effort to consolidate representation, HSH engaged Susman Godfrey L.L.P. Only later did HSH discover that members of Susman's New York office (who were not involved in the Aetna litigation) had performed work for Aetna—a conflict which Aetna was unwilling to waive. As a result, HSH retained Pierce & O'Neill, LLP. Lastly, HSH substituted Bateman Pugh Chambers, PLLC as attorney-in-charge and counsel of record.

34.     Upon the District Court's decision against HSH being overturned, I intend to seek to collect these offset amounts, among other amounts owed to HSH by Aetna.

**Cigna Litigation**

35.     Another reason why HSH is confident that it will prevail against Aetna on appeal is that in a virtually identical case, Judge Kenneth M. Hoyt awarded HSH final judgment in the amount of $16.4 million, plus interest in damages, penalties and attorneys' fees against Connecticut General Life Insurance Company and Cigna Health and Life Insurance Company (collectively, "Cigna") after a nine-day bench trial.   Cigna is an insurer that asserted nearly identical claims against HSH (the "Cigna Complaint") in the District Court and was also represented by Aetna's lead attorney, John Shely of Andrews Kurth Kenyon LLP.   The Cigna Complaint alleged price gouging and fraudulent billing by HSH.   HSH has always been an out-of-network provider with Cigna.   Cigna alleged that HSH had submitted $52.6 million in bills to Cigna over three years and Cigna had paid HSH over $8.6 million (16.3%) relating to these claims. The Cigna Complaint alleged – and HSH vigorously denied – that HSH did not reveal to Cigna that it had waived the patients' share of the bills and that HSH's owners were referring physicians with fee-splitting agreements that Cigna alleged presented inherent conflicts of interest.   Judge Hoyt concluded:

> There is no evidence that Humble supplied false information, failed to exercise reasonable care in supplying claim information, or failed to supply information necessary for processing its claims.   Rather, the evidence shows that Humble submitted claims for payment to Cigna with correct CPT codes for service provided.   The evidence also shows that Cigna never challenge[d] the codes reported by Humble on its UB-04 claim forms…. The evidence shows that Cigna flagged Humble's claims, failed to properly notify Humble that it was changing its claims processing method and failed to provide a reasonable opportunity for a full and fair review of Cigna's decisions with regard to Humble's claims.

Cigna has appealed Judge Hoyt's ruling to the Fifth Circuit and the matter has been fully briefed.

36.     A further reason why HSH is confident that it will prevail against Aetna on appeal

is that in a decision issued on June 15, 2016 in an unrelated case in favor of defendant North Cypress Medical Center, Judge Hoyt found no merit in the allegations of plaintiff Aetna, here again represented by lead attorney John Shely of Andrews Kurth Kenyon LLP, that North Cypress Medical Center had committed common law fraud, healthcare fraud or misrepresentations in over 44,000 claims at issue. Following a three-week trial, the allegations were fully rejected by the District Court, and the District Court refused to award any of the $225 million in damages sought by Aetna. The District Court found that there is not "a scintilla of evidence of fraud" on the hospital's part and that North Cypress Medical Center did "not engage in fraudulent conduct."

**Genesis Litigation**

37.     On January 17, 2017, Abira Medical Laboratories, LLC d/b/a Genesis Diagnostics and Genesis-Humble Management Services, LLC (collectively, "Genesis") filed an Original Petition and Application for Temporary Restraining Order and Temporary Injunction[6] (the "Genesis Petition") in the 152nd Judicial District of the District Court for Harris County, Texas against HSH, Holdings, K&S ASC, K&S Management, and certain non-debtors (collectively, the "Genesis Defendants"). Genesis alleged a breach of contract regarding a series of agreements entered into between Genesis and the Genesis Defendants in 2016 (the "Genesis/HSH Agreements") as well as fraud related to certain misrepresentations and omissions made by the Genesis Defendants and relied upon by Genesis. The Genesis Defendants submitted a general denial of all claims in the Genesis Petition. The Genesis Defendants allege that they terminated the Genesis Agreements due to material breaches by Genesis, rendering the Genesis/HSH Agreements null and void. Similar agreements were entered into between Genesis and certain Genesis Defendants regarding Westside Surgical Hospital, LLC that are unrelated to HSH. On

---

[6] Cause No. 2017-03271.

January 30, 2017, Genesis and the Genesis Defendants entered into a Rule 11 Interim Agreement to, among other things, attend mediation and set a temporary injunction hearing on or before March 15, 2017.  On February 20, 2017, the parties attended mediation, which was unsuccessful.    The Debtors intend to reject the Genesis Agreements.

## FIRST-DAY MOTIONS

38.    Contemporaneously with the filing of these Chapter 11 cases, the Debtors have filed a number of First-Day Motions.  The Debtors have scheduled a hearing on these motions for February 27, 2017 (the "First-Day Hearing"), during which the Court will entertain the argument of counsel with respect to the relief sought in the First-Day Motions.

39.    Generally, the First-Day Motions have been designed to meet the immediate goals of: (a) maintaining adequate patient care; (b) establishing procedures for the efficient administration of the cases; (c) continuing the Debtors' operations during these cases with as little disruption and loss of productivity as possible; and (d) maintaining the confidence and support of vendors, customers, employees, physicians, insurance companies and other key constituencies.

40.    I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in the Chapter 11 Cases.

41.    The First-Day Motions are identified and more fully described below.[7]

---

[7] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day Motion.

***EMERGENCY MOTION OF THE DEBTORS FOR ORDER DIRECTING JOINT
ADMINISTRATION OF CHAPTER 11 CASES***

42.     As discussed above, HSH is a Texas limited liability company operating a hospital
in Humble, Texas.   Holdings is a Delaware limited liability company with a sole purpose of
owning an interest in HSH.   Holdings owns 564 units in HSH, or approximately 60% of the
membership interests.   K&S ASC is a Texas limited partnership and is the sole member of
Holdings.   K&S Management is a Texas limited liability company and is the general partner of
K&S ASC.   A chart detailing the Debtors' organizational structure is attached hereto as **Exhibit
A**.

43.     Joint administration of these Chapter 11 cases (a) is warranted because the Debtors'
financial affairs and business operations are closely related, and (b) will ease the administrative
burden on the Court and parties in interest in these cases.

44.     The Debtors anticipate that numerous notices, applications, motions, other
documents, pleadings, hearings, and orders in these cases will affect all of the Debtors. With four
(4) affiliated debtors, each with its own case docket, the failure to administer these cases jointly
would result in numerous duplicative pleadings being filed and served upon parties identified in
separate service lists. Such duplication of substantially identical documents would be extremely
wasteful and would unnecessarily overburden the Debtors, the Clerk of this Court (the "Clerk"),
creditors, and other parties-in-interest in these Cases.

45.     Joint administration will permit the Clerk to use a single general docket for the
Debtors' cases and to combine notices to creditors and other parties in interest of the Debtors'
respective estates. Joint administration also will protect parties-in-interest by ensuring that such
parties in interest in each of the Debtors' respective Chapter 11 cases will be apprised of the various
matters before the Court in all of these cases.

46.     The Debtors request that the official caption to be used by all parties in all pleadings in the jointly administered cases be in the form set forth in the motion. The Debtors submit that use of this simplified caption will eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification.

47.     The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and party in interest will maintain claims or rights it has against the particular estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the efficiencies and reductions in costs resulting from joint administration. The Court also will be relieved of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee also will be simplified.

48.     It would be a misuse of judicial resources to conduct separate hearings on separate motions that will seek almost identical relief by the multiple companies who share some of the same liabilities and have overlapping management.

### *EMERGENCY MOTION OF THE DEBTORS FOR ORDER EXTENDING TIME TO FILE SCHEDULES AND STATEMENTS*

49.     Pursuant to this motion, the Debtors seek the entry of an order extending the time within which they must file their schedules of assets and liabilities, lists, and statements of financial affairs (collectively, the "Schedules") for a total of forty-five (45) days from the Petition Date, without prejudice to the Debtors' right to request further extensions should the need arise.

50.     The Debtors submit that cause exists sufficient to extend their time to file the Schedules in view of the facts and circumstances of these cases. Due to the emergency nature of

the bankruptcy filing, the Debtors have not yet had sufficient time to collect and assemble all of the requisite financial data and other information and to prepare all of the Schedules required by the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

51.     The Debtors' Chapter 11 petitions were accompanied by, inter alia, (a) individual resolutions authorizing the filing of such petitions, (b) a list containing the names and addresses of each of the Debtor's forty (40) largest unsecured creditors, excluding insiders, and (c) a list of equity holders for each Debtor.

52.     To that end, the Debtors have already begun and will continue to work diligently to compile the information necessary to complete the Schedules. Specifically, the Debtors must gather information from various documents, sources, and locations and complete the posting of their books and records as of the Petition Date or other dates, as appropriate. Then the Debtors must review that information and prepare and verify the Schedules. However, given the critical matters with which the Debtors have been and are currently dealing, the Debtors do not believe that they will have sufficient time to complete preparation of the Schedules within the fourteen (14) days required by Bankruptcy Rule 1007(c). The Debtors therefore believe that they will need an additional thirty (30) days from the deadline required by Bankruptcy Rule 1007(c) to prepare and file the Schedules.

53.     The narratives and data incorporated into the Chapter 11 petitions and the exhibits attached thereto provide creditors and parties in interest with a substantial amount of information about the Debtors and their financial affairs. Additionally, upon reasonable request, the Debtors will provide parties in interest with material information concerning their business and financial affairs, including information that will be contained in the Schedules, as such information becomes available.

***EMERGENCY MOTION OF THE DEBTORS FOR ORDER (1) AUTHORIZING DEBTORS
TO PAY CERTAIN PRE-PETITION EMPLOYEE AND WITHHOLDING OBLIGATIONS,
AND (2) DIRECTING BANKS TO HONOR RELATED PRE-PETITION TRANSFERS***

54.     The Debtors seek to retain their current employees (the "Employees") during this critical time, maintain morale, encourage future business, and minimize the personal hardship such Employees may suffer if prepetition, employee-related obligations are not paid when due, or honored as expected.  The Debtors, by this motion, are seeking authority, in their discretion, to pay and/or honor, as the case may be, (a) certain prepetition claims of non-insider Employees, including, but not limited to, claims for wages, salaries, vacation, sick leave, and unpaid reimbursable expenses and certain costs and disbursements related to the foregoing (collectively, the "Employee Compensation"), up to the statutory cap of $12,475 per Employee, and (b) all prepetition federal and state withholding obligations. The Debtors further request that the Court enter an order directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

55.     The Employees – including registered nurses, dieticians, technicians, managers and housekeepers – are essential to the continued operation of the Debtors' businesses.   The Employees' morale directly affects their effectiveness and productivity.  Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their patients, and other customers, the

value of their assets and businesses, and their ability to achieve their objectives in Chapter 11.

### *EMERGENCY MOTION OF THE DEBTORS FOR ORDER (1) AUTHORIZING MAINTENANCE OF BANK ACCOUNTS AND CONTINUED USE OF EXISTING BUSINESS FORMS AND CHECKS, (2) APPROVING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (3) WAIVING CERTAIN INVESTMENT AND DEPOSIT GUIDELINES, AND (4) GRANTING RELATED RELIEF*

56.     The Debtors operate a consolidated cash management system which is described in this motion. As set forth therein, the system builds in efficiencies that should be preserved during the Chapter 11 cases for the benefit of the secured parties as well as to keep costs and administration to a minimum, which will benefit all creditors.

57.     By the motion, the Debtors seek an order: (a) authorizing the continued use of the Debtors' existing bank accounts and continued use of existing business forms and checks; (b) continued use of the existing cash management system; and (c) providing any additional relief required in order to effectuate the principal relief sought in the motion. The relief requested will help ensure the Debtors' smooth transition into Chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtors' and its Employees' attention from more pressing matters during the initial days of these Chapter 11 cases. A chart and explanation of the Debtors' cash management system are included with the motion.

### *EMERGENCY MOTION (I) FOR INTERIM AUTHORITY TO USE CASH UNDER 11 U.S.C. §363 AND §105 AND (II) REQUEST FOR A FINAL HEARING*

58.     Pursuant to this motion, the Debtors are seeking authority for the use of the Cash Collateral, as defined therein, and to grant to the Secured Lender, as defined therein, adequate protection for claims arising from the diminution of value of its collateral from the Debtors' use of the Cash Collateral.

59.     It is essential to the Debtors' post-petition operations, the maintenance of the value

of their Businesses (as defined therein), and patient welfare that they use the Cash Collateral. The Cash Collateral will only be used to pay for expenses that are set forth in a budget attached to the motion, which has been shared with the Secured Lender's representatives.  Such expenses include, but are not limited to, employee payroll and other benefits, rent, rent on leased equipment, corporate overhead, inventory purchases, medical supplies, expenses related to patient health and welfare, various reorganizational expenses, and other expenses related to operating the Businesses.

60.     The Debtors have prepared a budget (the "Budget") that shows the Debtors' projected expenditures during the period from the Petition Date through March 12, 2017 (the "Budget Period"), and estimates the period in which such cash expenditures will either need to be paid or accrue. At this time, the Debtors anticipate that cash and receipts from operating the Businesses will be sufficient to satisfy the disbursements reflected in the Budget. After entry of a final order authorizing the use of Cash Collateral, and the expiration of the Budget, the Debtors will submit additional, amended, and/or supplemental budgets for periods occurring after the Budget Period.

61.     The reasons supporting the Debtors' use of Cash Collateral are compelling. As the Debtors have extremely limited funds, use of the Cash Collateral is required to fund the day-today operating expenses of the Businesses, including payments to employees, purchase of inventory and payment of other expenses necessary for patient health and welfare, as well as reorganizational expenses necessary to maintain the value of the Businesses. Unless this Court authorizes use of the Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtors' bankruptcy estates. Indeed, absent sufficient funds to support the Businesses, the Debtors will have to transfer patients to other facilities, and the value of the Debtors' assets will quickly erode. Therefore, authorization to use Cash Collateral

pending the Final Hearing is in the best interests of the Debtors' bankruptcy estates and creditors.

62.     In exchange for the use of the Cash Collateral, as adequate protection for the use of the Cash Collateral, but only to the extent of the actual diminution in value of the prepetition Collateral (as defined therein), the Debtors propose to grant to the Secured Lender replacement liens in the form of security interests and liens upon the same types and kinds of assets upon which they held a  prepetition lien, subject only to valid, perfected, and enforceable prepetition liens (if any) which are senior as of the Petition Date, as well as an additional lien upon the Debtors' post-petition accounts and accounts receivables. The grant of replacement liens will only apply to the extent that the prepetition Collateral was encumbered by valid and perfected liens and security interests (collectively, the "Replacement Liens").  The Replacement Liens will not attach to any avoidance actions under Chapter 5 of the Bankruptcy Code.

## CONCLUSION

63.     The primary purpose of the filing of these Chapter 11 cases is to maintain quality patient care, prevent deterioration of these bankruptcy estates, and protect the going-concern value of the businesses operated by the Debtors.  In the interim, through the First-Day Motions described above, the Debtors seek to minimize certain adverse effects that these Chapter 11 cases might otherwise have on their businesses, while honoring the spirit of the Chapter 11 process.

64.     In order to maintain quality patient care and to preserve the value of their businesses to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 cases by minimizing the adverse impact of the filing on the Debtors' assets, employees, physicians, patients, and insurance companies.  For the reasons described herein and in the First-Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced

if this Court grants the relief requested in each of the First-Day Motions and respectfully request the Court to do so.

Under penalty of perjury, I declare that the foregoing is true to the best of my knowledge and belief.

Dated: February 27, 2017
       Houston, Texas

_____
Jeffrey M. Anapolsky

**Exhibit A**

